The Honorable, the Judges of the United States Court of Appeals for the 4th Circuit. All right, we'll proceed with the United States v. Rafiekian. And Mr. Grano, we'll hear from you first. Thank you, Your Honor. Good afternoon. It's Ben Taft Grano on behalf of the United States. Obviously, there are a number of issues in this case more than can be covered at oral argument. So I thought I would start with some that the government views as most central to the case. First, the standard for a Section 951 violation that we believe the district court improperly heightened by adding elements, both with respect to its references to civil agency law and with respect to treating the legal commercial transaction as an element of an affirmative defense. After that, if time permitting, I'd like to address some of the evidence in the case, as well as our view that the district court's new trial orders were legally erroneous, in some cases because of procedure and in some cases for failure to apply the governing standards. Turning first to the standard for a Section 951, the Supreme Court has been extremely clear that courts are not permitted to add elements to the plain language of a congressional statute. And that's precisely what the district court did here, both by referencing an inopposite area of civil agency law and by disregarding canons of statutory interpretation that would provide that an exclusion from a definitional provision is an affirmative defense of a statute and not an element. Well, even if even if you're right and the court imposed on you an additional burden, an additional element to prove and defined agency narrowly, the jury still went your way. Doesn't that obviate some of that? It does, Your Honor. Actually, the district court did not instruct the jury specifically on civil law agency. This was something that came up after the jury had been instructed after Rule 29 hearing. But for purposes of this court having... But it did add that element and sort of just in passing and told them it couldn't be a commercial transaction. Yes, it did instruct the jury that a commercial transaction, a legal commercial transaction was an element that the government had to disprove to get a conviction. Under Masaccio, of course, when conducting a sufficiency review, the court disregards any erroneously heightened elements. However, for purposes of the law in this area going forward, given that 951 is not an often charged statute, the government thought it was important to present this court with its view of what the correct standard for a sufficiency review would be. In particular, our view is that because there's no indicia that the common law was the area from which Congress drew a concept of an agent of a foreign government or the definition that it added to the statute in 1984, that it's improper to import an opposite civil law concept of agency into the statute. And I think our two best cases for this are food marketing and Bruceowitz, where the Supreme Court said that just because words in a statute bear some resemblance to a common law concept, that's yes or no. Ms. Grano, let's just say we agree with you that this is not an element of the crime. Where does that lead us in terms of analyzing the sufficiency of the evidence? Sure. I think it depends on how far you agree with us, Your Honor. If you agree with us that no civil law agency goes into it and agree with us that the agree to operate in the United States language refers only to a unilateral intent, I think that seriously vitiates the district court's sufficiency review. Okay. It looks like I short-circuited you a bit then. No, no. Please go ahead. You know, I don't fully understand why you're so afraid of the common law of agency. I mean, the common law of agency includes any person who does something for another person for a specified purpose, to obtain the purpose for the original person. It does also contain master-servant concepts, which are much higher control. But it seems to me, if you have to run into the common law of agency, other than an ordinary sense of what it means to be an agent, it doesn't go one way or either other. It doesn't seem to implicate anything here because clearly the allegation that you make is that the Flynn firm was hired to accomplish a purpose by the Turkish government and was hired and paid a fee for that purpose. And for somehow, everybody got involved in notions of, well, I don't know quite what, but it seems to me the question is whether the jury was properly instructed on that and whether there's sufficient evidence to find that. I think that's correct, Your Honor. And the jury instruction is only as part of the commercial transaction, which we do think is an important thing to clarify. So maybe I'll move to that next. Based on this court's precedent in Royal, the statutes are almost identical except for the comma and the period distinction. And so we do think that when conducting the sufficiency review, this court should focus on just the definition of an agent of a foreign government leaving out the core exclusions underneath the statute. Assuming the court agrees with us on all of those points, we think the evidence is more than sufficient. The defendant's arguments really focus on taking circumstantial evidence and separating it out from the overall fabric of the case. Most of the arguments deal with when a particular rationale or an explanation was given. There's contemporaneous documentation showing that wasn't how it was characterized at the time. In some cases, there's emails directly contradicting the statements that Mr. Rafikian or Mr. Alpachin communicated to Covington lawyers in the investigation leading up to the filing of the FARA letter. And in all of these cases, we think this is a paradigmatic example of the jury weighing competing credibility and inferences about whether or not a defendant's sort of self-exculpatory explanations for his conduct are believable or not. And based on that, this is a paradigmatic example of a case in which resolving those inferences are left to the jury. If the court has no questions on those, I'll move to some of the new trial orders. Let me ask you one question regarding the unilateral agent proposition you put forth. Tell me, how do you say someone can be, can unilaterally agree to be an agent? Well, Your Honor, in civil agency law, of course you can't. But we think that's the wrong standard. Well, I don't understand that answer. How can you say that's not so? If I hire a real estate agent to buy a house for me and agree to pay a fee, and the agent does it, that's a unilateral transaction. It depends on the real estate agent's performance. Well, Your Honor, it has to do with the... These people, allegedly, you argue that the Turkish government hired the Flynn firm to accomplish a purpose in exchange for a fee. Correct, Your Honor. So why are we involved in bilateral contracts, unilateral contracts? That's a contract. Yes, Your Honor, we think that the evidence is sufficient to show that Turkey was acting through Alptekin and that even on a standard of bilateral assent, we have sufficient evidence in this case. I don't understand what this bilateral assent... Why are you hesitating on that? Your Honor... If they agreed to pay a fee, that's their side of the agreement. And on the Flynn side is agreeing to do the work. Correct, Your Honor. Right? Correct. So what are you getting into some probably inappropriate discussions of bilateral and unilateral? Unilateral contracts, fine too. If you climb the flagpole, I'll give you 50 bucks. You don't have to climb the flagpole, but if you climb it, I owe you 50 bucks. I apologize, Your Honor. I think I understand where some of the confusion might be coming from. We're not talking about concepts of promises to pay for performance or bilateral... Well, that's a bilateral contract. Yes, Your Honor. What we're talking about is whether or not there needs to be a meeting of the minds that a particular person is going to act as an agent within the meaning of civil agency law. So this would be, for example, the first section of the restatement, that you have to manifest an assent that someone acts on your behalf, and then they have to consent to do so. We don't think that's the legal standard. We think the evidence is sufficient to meet that standard if that's the one that the court imposes. But that's different than whether or not contracts are imposing mutual obligations or unilateral obligations. Why isn't that mutual? Because the hiring of the Flynn firm was in exchange for the payment of a fee. So the assent is one side pays the fee and the other side does the work. It would be, Your Honor. Okay. I must say, you have a nice way of derailing everything. I apologize, Your Honor. It's not my intent. I have a question, Mr. Grano. Yes, Mr. Charles. Do you agree that your conspiracy evidence is a little bit more thin than your evidence on the substantive 951 charge? And I'm not really asking you to concede anything, but that's my concern, that you have a stronger case on the substantive 951. And so when you're discussing the evidence, if you could particularly talk about the object of the conspiracy that you think the evidence supported and go into that in a little bit more detail. Yes, Your Honor, of course. I do think that the conspiracies stand in a different position. This was charged as a double object conspiracy. And of course, either one would be sufficient to sustain the count. I think the evidence is strongest with respect to the conspiracy to act as an agent of a foreign government as opposed to the willful misstatement on the FARA, which is the other object. With respect to the agreement to act, I think in this case, a lot of the evidence showing what we might refer to as the bilateral agreement between Turkey and Rafikian to act as their agent is also the very same evidence that shows an agreement between at least Rafikian and Alptekin and potentially Turkey itself and an official on Turkey's behalf to act as an agent in the United States. In this context, I would say a lot of the best evidence is that Alptekin created opportunities for Rafikian to meet with the foreign minister and other cabinet-level ministers at which a statement was made that the Turkish government's goal is to obtain Gulen's extradition. And in this case, then Rafikian went back to FIG and with respect to every communication afterwards declared that to be their ultimate aim and the purpose of the ultimate opportunity. And then there's all of the discussions between Alptekin and Rafikian with respect to confidentiality. We see the same misstatements and false cover stories repeated between the two of them. What I'm concerned with in this case is all of the hearsay that was admitted. You know, Judge Trent is a good judge, and I think that he really came out of this trial very concerned about the fact that, what, over 100 pages of hearsay evidence not admitted for the truth? And I know the jury was instructed a myriad of times, not just once, on how to treat this evidence. Could you tell us how much or was there evidence outside these hearsay statements? And emphasize for us what it was that established that first object of the conspiracy, the conspiracy to act as an agent of the Turkish government. Yes, Your Honor. So I would say there's some conduct elements that show Alptekin acting in this capacity. These would be the weekly catch-up calls in which the FIG engagement was discussed. You know, not anything said on the calls offered for the truth of the matter, but the fact that there's an ongoing relationship in which they discuss the engagement. The arrangement of the meeting with the Turkish ministers.  You're talking about the New York meeting? Sorry? You're talking about the New York meeting? Yes, Your Honor, the September 19th meeting that Alptekin arranged. And then a statement from Rafikian, which is, of course, permissible for the truth of the matter, that he had a following, a subsequent conversation with Alptekin talking about expectations, trying to manage those, saying we'll deliver what we promise. So I think in conjunction with not just Alptekin's statements, which are admissible for what Rafikian knew to be happening or what he understood to be happening, there's other indicia that don't come from Alptekin's own statements that show him participating in Rafikian's actions on behalf of the Turkish government in the United States for this purpose. Well, there's also the parallel object of trying to get Gulen back to Turkey and he being the leader of the opposition, and also the disparity in the flow of money coming from Turkey and then returning in small part to Netherlands. Correct, Your Honor. Which is indicative of Alptekin acting in a different role than just for himself. Correct, Your Honor. We think the financial payments with the 20%, what we've termed the kickback back to Alptekin, is extremely probative, because as I stand here today, I have not heard an explanation for why a client would pay his employee or his contract firm a certain amount of money and then get 20% back as a consulting fee. And we think that's very strong evidence that Alptekin was acting as an intermediary for another person or another entity. And the other circumstantial evidence in the case, such as the meetings and the purpose of the engagement, indicate that that other person was Turkey. I'm a little bit over my time. If the court has further questions, I'm happy to keep going, but otherwise... All right, thank you. All right, we'll hear from Mr. Is it Tice or Teese? It's Tice. Tice. Okay, we'll hear from you. Good afternoon and may it please the court. James Tice on behalf of the defendant. There was some talk about the standard of agency under the statute, so I'll go right there. The district court correctly held that no reasonable jury could conclude beyond a reasonable doubt without speculating that Rafikian acted as a secret Turkish agent and that he agreed to operate pursuant to Turkey's direction or subject to its control. Now, the government says that it can use essentially a watered down definition of agent that dispenses with any requirement of showing any proof that a foreign official was ever involved in the relationship. But that interpretation conflicts with section 951's text, the regulation, as I'll show, the context and the history, and it would have the effect of criminalizing merely acting in a way that benefits a foreign country absent proof of any meaningful foreign direction, control... I guess if I understand your argument... Your argument is it's clear that the Flynn group had an arrangement with Aptekin, but that Aptekin was acting on behalf of the government was not clear, and you argue it wasn't even proved. And so really what you're saying is it's not an agency issue, it's whether who was the agent on the other side. Was Aptekin and Nova acting on their own behalf as a private enterprise, or were they acting on behalf of the Turkish government? And there's not sufficient evidence to show they were acting on behalf of the Turkish government or a government official. That's what I think... That's what I understand your argument, isn't it? That's right, Sharada. That goes to the substantive point. But sticking with the standard for one moment, and I'm very happy to address the substantive evidence of what the government did or did not prove. But speaking for the standard for a second, the way we understand the government's non-mutuality argument or unilateral argument is that all it needs to prove is that someone was acting essentially consistently for the benefit of another... of a foreign country or a foreign official. You don't actually need to show that a foreign official knew about what was happening. You don't need to show that they consented to it or agreed to it. Well, just staying with that, I want to grant you your argument on whether the Turkish government was involved. But if you just assume Aptekin was... hired the Flynn firm to act as agent for him and his firm, the question there seems to be answered simply by saying, will you do this work for us for a fee? And the other side says yes, and then a fee is paid. It seems to me the one is the agent of the other. Now, that doesn't prove that Aptekin was the agent of the government, but it does prove that the Flynn firm was acting as agent at least for Aptekin. And it could be Aptekin in his own self-interest and his corporate interest, or Aptekin as a go-between with the government. Now, the government's theory is he was acting as a go-between with the Turkish government, and that's the rub in the case, but... I agree, Your Honor, and that's where we think that there simply was no evidence. I mean, I think the district court summarized... went through the evidence very carefully and summarized this. I think it's helpful to put it into kind of three categories. First of all, what was the evidence of Turkish involvement? Well, the government's not... Well, let me ask you on that. Initially... I mean, this is an interesting case because of the way in which it proceeds, almost with stealth, given what was being done. Initially, the project is called Truth. And when it's Truth, your client says, you know, Turkey would have been the client for the project Truth. But then it morphs over into something called Confidence. Kind of seamlessly morphed into it. And there's all kind of emails. Looks a little cryptic to me. But at the end of the day, when you look at this, you've got Aptekin, who is out there. He has some reason for doing it. But he doesn't come to testify to this, does he? He does not, Your Honor. He was charged in the indictment along with my clients. Therefore, essentially guaranteeing that he would not be available to testify in this case. And that's why the government sought to introduce his evidence under the hearsay, and one of the hearsay exceptions the district court found by preponderance of the evidence that no such conspiracy was proven. To your point about... But surely, if you could have... If the government had done something like give him immunity or some other way, maybe get a pardon or whatever, he wouldn't have that. And he testified. From your perspective, that would be... It wouldn't be hearsay anymore. Let's put it that way. The evidence of what he did. We agree with that, Your Honor. And you mentioned pardon. Obviously, that's exactly what happened to the owner of the Flint Health Group, who was the leader of this engagement. The government had taken the position that he was not a co-conspirator at all until about a month before trial when it flipped positions, when it found out... But it flipped his position after he recanted some statements. He went and got him some lawyers and recanted statements. And when you went to trial, I don't quite understand how that all comes up. The government does stuff. And, of course, now we see this in all kind of cases. I mean, this is... It's interesting the way we are analyzing... You analyze and look at this case and the way we look at it. But, I mean, the way in which these cases go, I mean, you've got money laundry cases, RICO cases, all kind of cases in which you... The white-collar cases are like this. And then even the lower level. And so when you get in the business of, you know, should the court have allowed, you know, this evidence against that one to then have been brought in? You know, when you've got evidence he's recanted, you can't bring him in as a witness because he's taken his statement back after he's gotten counsel and stuff or whatever. Explain that, Siliquoy. I don't quite understand what happened there. Well, the sequence of events, Your Honor, was that he, according to the government's representations in other courts, he refused to testify the way that the government had expected him to, at which point they decided not to bring him. Since then, of course, the United States government has moved to dismiss the indictment on unrelated charges, saying it never should have been brought post his guilty plea, and now he's been pardoned. But we're getting off track a little bit. So I guess, let me ask you, if this case did go back for a new trial, you could call that witness now? Potentially, Your Honor. We could not have called him before, presumably, because he would have taken the Fifth, but potentially now that he's been pardoned. But I don't think it's necessary to return this case for a new trial because the government's evidence was, as the district court said, extremely speculative and entirely circumstantial. And if I can speak briefly about what I just recapped... But now, the circumstantial aspect of evidence like this, when I think about a case like this, and if you wanted to draw up a blueprint for how to do something like this, it would be in this kind of a manner, where you would never ever make that connection directly, but you would use code words, or you would say it in a cryptic way, and ultimately you couldn't make the connection. But you could do everything that would be just a substantive crime, but you couldn't make that connection because it's going to be hearsay if you can't get someone other than the person who's alleged to be representing the country to testify. Well, I'd love to make two points in response to that, Your Honor, if you'll allow me. The first is that... Please. There's different kinds of circumstantial evidence. There's circumstantial evidence such as if the government had presented evidence that Turkey had actually funded this agreement. That would be circumstantial evidence that Mr. Deacon had agreed to operate as a foreign agent. But they didn't do that. They didn't put on any evidence of where that funding came other than from the person that everyone testified was the client. They probably won't ever get that. You're not going to get a foreign country to come up here and say we actually gave it. It's going to be someone put forth in this manner who will come forth and actually take actions, and all you're going to get is that we have officials, a high-level officials type stuff. I just don't foresee a country of this sort that's going to give you direct evidence. That's not diplomatically good. Well, there is manners of getting evidence. In fact, the government did get evidence from the government of the Netherlands in this case. It just didn't do so from Turkey, and that's at JA... But didn't we get just that with that meeting up in New York? I mean, they all met up there in New York. They got together in a room, and they didn't get up there just to have drinks and have a good time. They were actually meeting with Turkish officials, weren't they? They were, Your Honor, but if you actually look at the pages that discuss that meeting, I mean, just to take a step back, it's clear that Mr. Rafikum and the Flynn Intel Group are seeking to be retained by Turkey in the beginning of August. It doesn't work out. They end up being retained by a private company instead, and that's what the evidence consistently shows after that. Now, the government suggests that this meeting, which was disclosed in the FARA filing, this background for the project they were working on, shows that... Well, you disclosed it in the FARA filing, which you characterized as being late, which, you know, there's a history there, too, because instead of doing it from the beginning, you went under a lobbying disclosure act or something, which didn't require you to do certain things, and then all of a sudden when you get the law firm involved, you do it late, you now disclose it, but the truth of the matter is, except, I guess, for the safe harbor language within the agents act, I thought it required you to file it within 10 days of taking these acts. Well, the lobbying disclosure act, Your Honor, satisfies any sort of FARA and Section 951 obligation as long as a foreign nation is not a principal beneficiary. So, you know, it was only late once Covington made... But, I mean, that's part of the conscious choice. You knew that this FARA needed... You all noticed you had a lot of wanting that needed to be done, but you didn't want it to be seen. You didn't want it to be known, so the way to kind of hide it, I guess, was to put it as a lobbyist, but there was never any lobbying act done, was it? Well, Your Honor... I mean, really, in terms of the substantive part of a lobby disclosure act, there was no lobbying ever done, was it? There was a small amount of lobbying done. The government never charged us with an LDA violation or anything of that sort. Oh, I got that. Certainly. Go ahead, Judge. I'm sorry. Mr. Tice, both confidence and truth, the projects listed as their primary objection or object was to paint Gulen in a negative light and to achieve his extradition back to Turkey. And it looked like, throughout this, your client was not being straightforward regarding whether truth and confidence were actually the same project. In his statements to the Covington lawyers and other statements, there was a suggestion that they were entirely separate, okay? But they had the same phase zero action plan that showed that, in fact, they were, or at least arguably a prior fact could find that they were the same. So it looks like there were conflicting circumstances in your client's posture that he was taking from which the jury could conclude he wasn't being truthful. Isn't that part of the fact finder's role as well, to assess whether these explanations wash with the rest of the circumstantial evidence in the case? I mean, I agree with you. But... Well, I just want to be perfectly clear, Your Honor. There was no such thing as Project Truth. It never came to fruition. Essentially, Altekin was seeking to... Flint Intel Group was looking for a new client. Altekin was looking for someone to work with who was negotiating with the Flint Intel Group about getting the project off the ground. Okay, I thought confidence started the same day that truth was abandoned. Is that correct? They decided to move forward under the project with a different client. There was no evidence put in that Turkey was that client. There was no evidence that suggested that Turkey was paying for the engagement, that it was passing along any instructions, that it was making any requests. Back to the district court. I'm sorry, but Mr. Tyson, then I won't interrupt you again. But my point is that it looks like Mr. Rafikian was giving different versions. He was arguing that confidence was entirely separate from truth, but it showed that the objectives that were being advanced were the same. There was other evidence. Going back to my question from before, wasn't the trier of fact entitled to say, wait a minute, something is wrong here. He was lying about this because we've seen this phase zero action item from truth, and we've heard about confidence too. And these things are essentially the same. Thank you, Your Honor. I think in terms of whether or not the jury could have made such an inference, I think the answer is no because juries are allowed to make logical inferences based on circumstantial evidence. I agree that circumstantial evidence and even false statements are evidence. But they do it all the time. They do it all the time. You've got an instance here where Aptekin is the same intermediary for both of these. You do it the same day, you've got the same purpose. If you're going to do a case like this, I'm thinking these are not easy cases to prove. I'm thinking you've got to rely upon reasonable inferences. Very seldom are you going to get an agent to come up and testify, the country has told me to do something and therefore I'm working with them. If you're going to do it, it's going to happen in this way. So when you give this to the jury, and he says, well, you've got this truth project that you say didn't exist, but that's a pretty strong thing because that looks pretty bad. So you separate yourself from that and says we've got the confidence, which is a separate thing, but it's the same guy. And you're doing the same stuff. So the only difference is now you've maybe divorced yourself from this opportunity or this now what we would call an obligation to go and report this thing to the Department of Justice, which apparently you didn't want to do until after you got canceled somewhere down the road and finally did a late filing of that. So there's a reason for all of this. If you want to do this kind of work and you want to do it in a clandestine, under-the-table sort of way, you want to try to avoid such things as coming, putting to the Department of Justice because those guys over there do a serious investigation on you when you start doing that, so you probably don't want them to know about it. So I don't see how you say the jury couldn't connect the two. I mean, certainly there's evidence to say they weren't, but in the cases like this, when we're looking at it, we rely upon reasonable inferences. And the district court went through all this evidence and sat through this trial and said that these were not reasonable inferences, that they were too speculative. If you don't mind, I'd like to make a quick point about Farrah, Judge Winks. I think you brought up an interesting point, which you said these are tough cases to bring, tough cases to prove, and I think that's right. There's only been three cases in the entire history of the Fourth Circuit that have even cited this section. All of them involved espionage-related allegations, conspiracy to pass along classified information to known foreign officials. And each of those cases... Because you don't think that... Just because you've only had three cases, you don't think in the history of this country there's only been three incidents of it, do you? It may be a hard thing to prove, but... Of course not. I don't think that tells us anything. If you only got three convictions in it... But I think that the issue here in this case is whether the evidence was sufficient for it to happen in a case like this. And my point is, Your Honor, the government says, well, you can have this agency definition that you don't need to show the involvement of any foreign official. You can just say, well, there was a lot of suspicious behavior. He was acting seemingly on behalf of a foreign government, but there's no actual evidence of an agreement or instructions or requests made by the foreign government. And what I'm saying is, in the other Section 951 cases, the only three that this Court has cited, all three of them did involve espionage-related activities. That did involve requests, instructions, direct communication with foreign officials. Can I ask you, when did the Turkey make a formal request for the return of Gulen in relationship to the formation of truth in this case? I believe, Your Honor, it was shortly after the expedition. I mean, excuse me, shortly after the coup attempt. So I don't know. So Turkey was already on public record requesting a return of Gulen. Very much so, Your Honor. And in fact, Turkey... So now we have this engagement in truth, which is to turn the American government against Gulen to facilitate his return. Yes, and one of the... Six days later, right? Well, Turkey actually contemporaneously hired another agent, an actual agent, Robert Amsterdam, an associate of his law firm, to do exactly what Mr. Altekin was trying to convince the Turkish government to do with my client. Yeah, but there are different methods for doing things, different avenues. And if you had three or four, you'd follow all three or four if you were the Turkish government. This was a big deal to get legitimacy. And here you have truth hired specifically to assist the object, to assist the object that Turkey had announced publicly. And that engagement lasts for a few days and is only between Reptikin, Flynn, and Aptekin. That's the only three to the truth thing. They have exchanges of what they're going to do, what they propose to do. They have the acceptance of the engagement. And then at the next steps, the email said, we now get our firm operated. On that very day, they changed the name to confidence and started using very generic terms about what they're engaged in. But the purpose remained the same, as far as I can tell. Your Honor, I would just briefly say, just acting on behalf of a foreign country not under the direction of control does not satisfy the statutory standard. No, no, it's part of the circumstantial evidence. The question, one of the big questions is whether truth and confidence were one and the same. And if they were, was truth sufficiently connected to Turkey through these coincidental facts? They were trying to get Gulen back. They were trying to disengage Gulen. They were trying to get the government and the president saying, oh, Gulen really is a bad guy. He's a terrorist. And you ought to turn him back. It seems to me the parallel projects are part of the circumstantial evidence. And we talked about this other evidence of a meeting in New York and the payment of funds from a Turkish bank with a kickback going to a Netherlands bank. It's all a little funny. Well, Your Honor, that was the government strategy trial that suggests there was a lot of funny things going on. But ultimately, they didn't show that he was acting on Turkey's direction or on Turkey's control because that would require showing that some foreign official was actually involved in passing along instructions. And at this point, I think it's really significant, Your Honor, that Gulen was acting on Turkey's behalf. Well, the question you have to ask on that line, the question you have to ask is whether Aptekin was acting on Turkey's behalf as its go-between. Because Aptekin did reject some steps being taken and did approve some other steps being taken. And he did so in the name of Turkey. And so he could be self-promoting. There's no question. But you have to put all this together. As the government admitted below, though, it would depend on the nature of the agreement. Even if Turkey had hired Aptekin, and the jury could have inferred that that to be the case, it would still depend. At JA-2071 and also at JA-111 and 112, the government conceded below that you still need evidence that the defendant knew that Turkey was actually operating behind Aptekin and that he agreed to operate in that context. And on this point, I think it's really important to point to the fact that FARA actually does mimic the sort of theory that the government has here about Section 951. Section 951 says agent of a foreign government. You have to act at the direction and control of a foreign government. But FARA is much broader. It says you can be a representative, not just an agent. You can operate at a request, not just under the direction or control. And you can do it indirectly. Not for the benefit, primary benefit of someone. So the government, for whatever reason, did not charge a substantive FARA offense. That would have been presumably the simpler crime to charge here if it really thought that Turkey was behind all of this. Instead, it chose to accuse my client of being a secret Turkish agent operating in this clandestine manner. And if it turns out that it hasn't satisfied its burden of proof by actually showing direction and control from the Turkish side, well, then that means the judgments of acquittal should be affirmed. Now, I know I'm a little bit over my time. If you will answer one question, I just would like to get your response to. And that is, how do you view this 20% fee, this commission that was paid? It looks like a commission. How do you view that? I'm happy to address that, Your Honor. The record evidence was that everyone who testified said that they understood the project was being funded by Turkish businessmen. That came up throughout the record. So there was never any doubt that Altshuler was not paying out of his own pocket. He was trying to hook up the Flynn Intel Group with paying clients. When it fell through with Turkey, he got some of his Turkish businessmen to pay for it. And that explains the payment, Your Honor. He was, you know, at the end of the day, he was trying to get this project off the ground. So are you saying that 20% was a commission? I think it was described in the FARA filing that went to the government as consulting payments. I don't think it was a commission. That's how they structured it in their formal agreements. But, Your Honor, I think I would be remiss, you know, the government, and I think some of the questions today have gone to what are the sort of reasonable or permissible inferences that could be drawn here, even if you might disagree with them, could the jury? Well, that goes directly to the new trial ground on the sufficiency of the evidence. In that case, as both the Campbell case and the Souter case found, that is permissible for the district judge to, based on his own view of the record, seeing how this affected the jury over a six-day trial under an abuse of discretion standard, he is allowed to make those inferences. And again, that's exactly what the Campbell case says, that if the error the district court made was improper inferences, well, he's allowed to do that in the rare case. And I should note that he noticed, page 2149 of the JA, that this was rare circumstances. So he well understood that it's a rare remedy to grant a new trial on that weight of sufficiency. But at the end of the day, I would say, clearly, this judge who's experienced, who saw this trial, thought something went wrong here based on the presentation of the evidence, the position with respect to Flynn, all of the hearsay evidence that came in, Your Honor. And I think, again, it's really worth emphasizing that most of the evidence in the case, essentially all communications with Altikin, were not admitted for their truth. There's nearly 100 pages. And I think it's well within a district court's discretion to say, you know, a new trial is necessary in that circumstance when he, in his experienced judgment and discretion, determines that it affected the rights of my client. Happy to answer any questions. All right, thank you. Thank you. I see our time is over. And we'll hear now from Mr. Grano. Thank you, Your Honor. I'd like to start by addressing some of the evidentiary points, because I think the court has really honed in on the key elements of the circumstantial inquiry here. I'd emphasize, particularly, there's an email from Mr. Rafikian in which he says, after the project is named confidence, we have been at work on this engagement since July 31st. So that is a direct statement by the defendant that he viewed these as being the same project, starting, as Judge Wynn pointed out, six days after OIA denied the extradition request is when Altikin reached out to Rafikian and started this entire process. And it's not just that they had the same objectives, as Judge Keeton pointed out. They had the same playbook. They had the same budget. The same 20% was in both the truth budget and the confidence budget. The New York City meeting occurred after the transition to confidence. And so we have a Turkish official meeting at Altikin's instigation with FIG, announcing their goal, we want Gulen extradited to Turkey. And then you have Rafikian leaving that meeting and communicating to the rest of his team that that is what their ultimate aim is. We also have the false statements from Mr. Rafikian to the Covington lawyers after he was given an upjohn warning. And the jury heard testimony about what an upjohn warning is and can conclude that he knew that this was dicey territory and started distancing himself from what he thought Covington might figure out about all of this and then didn't turn over all of the Skype communications with Altikin on this subject. We also have some independent indications that Altikin was working on Turkey's behalf. In addition to the meeting, I'd point out that following the sort of disastrous meeting in Alexandria, Sphere Consulting, who was a FIG subcontractor on this, reached out to Altikin with a public relations proposal for the Turkish government. And Altikin, even though a bidding process had closed already, got them a late entry with the Turkish embassy where they met with Turkey's number two diplomatic officer in the United States. I think these are all indications that the jury can use to draw on the fact that there was in fact a Turkey-Altikin link that continued through the FIG engagement. I'd also point out again that when asked about these 20% statements, the story that both Rafikian and Altikin told was that these were refunds, even though no contemporaneous documentation established this fact, even though they were consistently characterized throughout the entire process as consulting fees. So this is again, as Judge Keenan pointed out, a falsehood that the jury can then infer guilty knowledge and guilty intent from. I'll turn next to the hearsay evidence and a point that Mr. Tice just concluded with, which is he said earlier that one of the key things we didn't prove was that Rafikian knew Turkey was behind Altikin. But that's one of the key things that the Altikin statements are permissible for, not for hearsay, but that he was told about Turkey's extensive involvement in it. Now, while we can't rely on those statements under the district court's limiting instructions to prove that Turkey was in fact behind Altikin, we can certainly rely on them for their impact on Rafikian's state of mind, particularly coupled with all of the indications that Turkey was actually involved, including the September 19th meeting. Lastly, I'll just touch on the new trial on the weight of the evidence order. We don't disagree that a trial judge is given deference in a new trial weight of the evidence context. The problem here is that in our view, the district court had already committed multiple legal errors on the standards for the substantive offenses, and then also didn't cite the governing standards for purposes of a weight of the evidence new trial order. As this court most recently pointed out in Chavez, mere disagreement with the jury's verdict or mere belief that the credibility determination should have been resolved a different way is not sufficient. Rather, the standard from Arrington since 1985 has been that the evidence must weigh so heavily against the verdict that it would be unjust to enter a judgment of conviction. And we saw no engagement from the district court on that standard and no explanation of how, while he might disagree with some of the jury's inferences, it crossed that extra additional threshold. And so we think that was an abuse of discretion. All right. Thank you. Thank you. Your arguments were informative and helpful, both of them. And this is a very involved case, and we thank you for your arguments. Our practice at this point would be to come down and shake your hands, and I particularly miss doing that today in view of the long work and the long involvement in this case, which was hard for you guys, and it's going to be hard for us, too. But we extend our greetings as if we were shaking your hands, and thank you for your arguments. We'll proceed on to the last case.
judges: Paul V. Niemeyer, Barbara Milano Keenan, James A. Wynn Jr.